STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ALETHEA M. SARGENT (CABN 288222)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6474
    FAX: (415) 436-7234
    alethea.sargent@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 22-mj-71170 MAG |
| Plaintiff, | **UNITED STATES' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRETRIAL DETENTION** |
| v. | |
| CESIA MEDINA-ZUNIGA, | Date: September 16, 2022 |
| Defendant. | Time: 10:30 a.m. |
| | Court: Honorable Joseph C. Spero |

**NOTICE OF MOTION**

TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that at the time and place specified above, or as soon thereafter as the matter may be heard, the United States will move and does hereby move this Court for entry of an order detaining defendant Cesia Medina-Zuniga pending trial.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The United States of America, by and through its counsel of record, hereby moves this Court for pretrial detention of defendant Cesia Medina-Zuniga. Across five controlled buys on July 12, July 19, July 26, and August 19, 2022, and her arrest September 8, 2022, the defendant sold or possessed for sale over 500 grams – over a pound – of fentanyl cut with mannitol. Even assuming the fentanyl to mannitol ratio was 1 to 10, the defendant sold or possessed for sale on those days enough fentanyl to kill 25,000 people.[1] But the evidence shows these were not isolated events. Rather, police reports from prior arrests in 2019, 2020, 2021, and 2022, and more recent location tracking data showing the defendant commuting to San Francisco's Tenderloin from her residence in Oakland, indicate that the defendant has been dealing narcotics regularly and frequently since at least 2019, and fentanyl since 2020, undeterred by prior arrests and filed state-level charges. In short, she presents an extreme danger to the community. Moreover, her current illegal status in this country (she is a Honduran citizen), her ongoing removal proceedings, and her lack of employment beyond her drug trafficking activity show her to be a flight risk who cannot be counted on to voluntarily appear on these charges. The government can demonstrate by clear and convincing evidence that the defendant poses an unmitigable risk of flight and danger to the public if released, and the defendant should be ordered detained pending trial.

## II. FACTS

### A. Medina-Zuniga sells officers 161.92 grams of fentanyl across a series of four controlled buys in a two-month period

In July 2022, the San Francisco Police Department (SFPD) was familiar with Cesia Medina-Zuniga as a frequent Tenderloin drug dealer, most recently of fentanyl, whose prior police contacts in the Tenderloin and still-valid stay away order had left her undeterred.

On July 12, 2022, an undercover officer made contact with Medina-Zuniga and asked her for "yellow," which is a slang term for fentanyl. Others in the immediate area were suspicious of the

---

[1] Two milligrams of fentanyl is a potentially lethal dose. U.S. Drug Enforcement Admin., Facts About Fentanyl, Feb. 23, 2022 (https://www.dea.gov/resources/facts-about-fentanyl). Although this memorandum uses gross weight calculations except where noted, a comparison of lab-tested weights following the first four controlled buys to gross weights showed that the small baggies that the defendant used for packaging weighed only about a gram a piece. The fentanyl has not been tested for purity.

UNITED STATES' DETENTION MEMORANDUM   1
22-mj-71170 MAG

officer; Medina-Zuniga asked to see his teeth and if he was a "narco." The officer showed his teeth, said that he was not, and told her he wanted "eighty," as in $80 in fentanyl. Medina-Zuniga weighed a quantity of white, chalk-like substance that she was storing in a bag under the feet of a nearby man and handed it to the officer. She also gave the officer her phone number for future transactions. The purported fentanyl was later lab-tested and found to weigh 8.11 grams net and to contain fentanyl.

On July 18, 2022, the same undercover officer texted Medina-Zuniga and told her he wanted an ounce (approximately 28 grams) of "yellow." They arranged to meet at Civic Center the following day. When the officer arrived at Civic Center and met with Medina-Zuniga, she handed him two small baggies containing a white, chalk-like substance in exchange for $300. The undercover officer asked her if she had more, and she said she had "rainbow," which is a slang term for fentanyl that has been dyed to appear a different color. The undercover officer bought an ounce of "rainbow" from Medina-Zuniga for another $300. The purported fentanyl was later lab-tested. One of the two baggies of white fentanyl was found to weigh 14.29 grams net and to contain fentanyl; the baggie of colored fentanyl was found to weigh 29.04 grams net and to contain fentanyl.

On July 26, 2022, the same undercover officer contacted Medina-Zuniga via text message and asked to buy two ounces of methamphetamine and one ounce of "rainbow." The officer again met Medina-Zuniga in the Tenderloin. In exchange for $1,000, Medina-Zuniga gave the officer "rainbow," "yellow," and methamphetamine. As he left, he texted her, "thanks see u next week," and she responded likewise. The purported drugs were later lab-tested. The "yellow" was found to weigh 27.16 grams net and to contain fentanyl. The "rainbow" was found to weigh 28.3 grams net and to contain fentanyl. The methamphetamine was found to contain 51.48 grams net and to contain methamphetamine.

On August 19, 2022, the undercover officer once again contacted Medina-Zuniga via text. When he later met her in person, he gave her $1,000, and she gave him "yellow" and methamphetamine. Although lab results had yet to come back when the complaint was filed, they now have. The drugs in the baggies of "yellow" were found to weigh 26.55 grams net and 27.02 grams net respectively and to contain fentanyl; the drugs in the baggie of purported methamphetamine was found to weigh 56.29 grams net and to contain methamphetamine.

### B. Medina-Zuniga is arrested with three quarters of a pound of fentanyl on her person and more in her residence

On September 6, 2022, the undercover officer asked Medina-Zuniga via text how much fentanyl he could buy for $2,000. She told him he could have seven ounces, and he told her he would meet her Thursday, September 8. That same day, September 6, the instant complaint against Medina-Zuniga was signed and arrest and search warrants were issued by this Court.

On the morning of September 8, 2022, officers arrested Medina-Zuniga as she left her apartment in Oakland. She was wearing a backpack that contained a large bag of suspected fentanyl, which officers believed to contain approximately seven ounces, in addition to other fentanyl. The total gross weight of the fentanyl in the backpack, including the separately packaged seven ounces, was 351 grams including packaging. Although lab results have not yet been returned on the fentanyl, two separate presumptive tests with a TruNarc analyzer were conducted on the bulk of the fentanyl. One test came back presumptive positive for fentanyl; the other came back presumptive positive for fentanyl compound or methamphetamine. When the search warrant was executed, officers found narcotics in Medina-Zuniga's residence, specifically 284.3 grams suspected fentanyl, 4.3 grams suspected cocaine base, and 21.6 grams suspected methamphetamine located in a backpack and a small safe. They also found a white container containing mannitol, a cutting agent. In the small studio apartment alongside the drugs were three small children, aged 11 months, four years, and six years. Medina-Zuniga is the mother of the four-year-old.[2]

//
//
//

---

[2] One article analyzing accidental childhood exposures to prescription fentanyl patches reported to the FDA between 2004 and 2013 noted that they had a case fatality rate of nearly 50%. *See* William Stoecker, et al., *Boys at Risk: Fatal Accidental Fentanyl Ingestions in Children: Analysis of Cases Reported to the FDA 2004-2013*, 113:6 Missouri Medicine 476 (2016), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6139757/. "The ability of fentanyl to kill children so quickly is explained by fentanyl's ability to suppress respiration-as quantified by the antinociceptive potency per milligram, fentanyl far and away leads all narcotics." *Id. See also* Jordan Parker, *Two Santa Rosa Parents Charged With Murder for Death of Toddler from Fentanyl Exposure*, San Francisco Chronicle, Aug. 5, 2022, *available at* https://www.sfchronicle.com/bayarea/article/Two-Santa-Rosa-parents-charged-with-murder-for-17355347.php (describing death of 15-month old; also referencing federal prosecution of individuals who dealt fentanyl to deceased father and thirteen-month-old).

UNITED STATES' DETENTION MEMORANDUM    3
22-mj-71170 MAG

### C. Medina-Zuniga has been dealing drugs in the Tenderloin consistently since at least 2019

#### 1. Medina-Zuniga has had six arrests for drug dealing, five in the Tenderloin, since 2019

Though she only has a single misdemeanor conviction for accessory after the fact (California Penal Code section 32), officers have caught her in the act of dealing drugs at least five times beyond the complained-of controlled buys between 2019 and 2022, with one of her arrests coming just over a month after her single conviction for identical conduct. Moreover, her conduct is concentrated in San Francisco's vulnerable Tenderloin, where she has continued to deal drugs despite having had a stay away from the area bounded by Geary, McAllister, Larkin, and Jones since her single 2020 conviction.

Medina-Zuniga was first arrested in California on October 3, 2019, shortly after it appears she came to this country illegally. Police observed Medina-Zuniga dealing drugs alongside another woman at 8th and Mission in San Francisco. When Medina-Zuniga was arrested, she was found to have in her jacket pocket eleven bindles of methamphetamine and $90.

When Medina-Zuniga was again arrested on July 13, 2020, at Golden Gate and Hyde, she had an outstanding warrant, which suggests she had failed to appear on her first case. On July 13, 2020, police observed Medina-Zuniga engaging in a hand-to-hand transaction. They also noticed that she was using a third party to hold her drugs in a black and tan backpack. Although he was holding the backpack, the bag-holder did not appear to interact with the bag; rather, Medina-Zuniga occasionally retrieved it from him to withdraw items. Following the transaction they witnessed, the police stopped the individual Medina-Zuniga had sold to and seized one bindle of cocaine base. When Medina-Zuniga was arrested, she was located with one bag of cocaine base containing eleven bindles and $1,545. The bag being held by the third party contained heroin, methamphetamine, and fentanyl (5.5 grams gross).

Following her July arrest, the San Francisco DA's office allowed Medina-Zuniga to plead guilty to a single misdemeanor violation of California Penal Code section 32 (accessory after the fact) for the 2019 incident. She was sentenced to four days in custody and two years of court probation, and the remaining charges stemming from the October 3, 2019, and July 13, 2020, incidents were dismissed "in the interest of justice." She also received a stay-away order from the area bounded by Geary, McAllister, Larkin, and Jones.

Medina-Zuniga was convicted of that single misdemeanor on August 28, 2020. But less than two months later, on October 15, 2020, she was arrested in San Francisco again, at Golden Gate and Hyde, within the area from which she had been ordered by the San Francisco Superior Court to stay away. A plain-clothes officer observed her engaging in a hand-to-hand transaction of cocaine base at a distance of just a few feet. Medina-Zuniga was arrested and found to have $504, cocaine base, methamphetamine, and fentanyl.

Medina-Zuniga appears to have failed to appear to state court on charges relating to the October 15, 2020, arrest, because when she was next arrested on July 20, 2021, for selling drugs at Larkin and Turk (in violation of the stay-away order), she again had warrants for her arrest. That time, Medina-Zuniga sold methamphetamine, which she had someone else holding for her in a beige-colored pouch, to a plain-clothes officer. At the time of that arrest, she had methamphetamine in her pocket, and the beige-colored pouch was determined to have methamphetamine, heroin, and almost 50 grams of fentanyl. The fentanyl tested presumptive positive for fentanyl using a TruNarc analyzer.

Medina-Zuniga's most recent arrest for drug dealing in San Francisco occurred on February 13, 2022, on the north side of the 600 block of Eddy – just steps to the west of the area covered by the Superior Court's stay-away order. Officers watched as Medina-Zuniga exchanged suspected narcotics taken from a black grocery bag she was holding with a man in exchange for money. Following the transaction, officers watched Medina-Zuniga hand the black grocery bag and the black backpack to a homeless man with whom they were familiar. When Medina-Zuniga was arrested, she did not have narcotics on her person, but the black grocery bag, which contained the small black backpack, was sitting next to the homeless man. The backpack was filled with suspected fentanyl, methamphetamine, heroin, and alprazolam. It also contained two digital scales. The fentanyl, contained in numerous plastic sacks and in various colors, weighed 291 grams and tested presumptive positive for fentanyl using a TruNarc analyzer.

Just a month later, on March 12, 2022, Medina-Zuniga was arrested in Oakland. Although the government does not have that incident report, the charges were again related to narcotics trafficking.

The cases arising out of the October 15, 2020, July 20, 2021, and February 13, 2022, incidents are all still open in the San Francisco Superior Court; all three have been referred to and are being heard

together in Community Justice Center Court, a diversion court that "[b]ridges the gap between communities and the Court and addresses issues that have led to a participant's criminal justice involvement through the use of restorative justice and treatment services for substance use, mental health, and other primary health issues."[3]  Ironically, given this case, the court received a "favorable report regarding the defendant's progress" at the last hearing date in late August.

### 2. Historical cell site data, live ping data, and physical surveillance have shown Medina-Zuniga traveling regularly and frequently between her apartment in Oakland and San Francisco's Tenderloin since June 2022

The Honorable Sallie Kim issued search warrants for historical cell site data and live ping data on August 12, 2022.  The historical data covered the period beginning June 1, 2022, and the ping data ended on September 9, 2022.  That data collectively shows Medina-Zuniga to have traveled to San Francisco's Tenderloin on a near-daily basis during the period in question and until her arrest.  Specifically, Medina-Zuniga traveled to San Francisco from her apartment in Oakland at least twenty times in June, at least eighteen times in July, and at least nine times between August 1 and August 12, 2022.[4]  Following the issuance of a ping data warrant on August 12, 2022, the case agent watched live as Medina-Zuniga continued commuting to the Tenderloin near-daily.  Physical surveillance also corroborates her travel: on August 23, 2022, narcotics officers followed Medina-Zuniga following her shift from the Tenderloin to her apartment in Oakland.

### D. Medina-Zuniga is in removal proceedings

As noted, Medina-Zuniga appears to have arrived in this country illegally a short time before she was first arrested for narcotics trafficking.  The government understands that she is presently in removal proceedings.

//

//

---

[3] *See* Collaborative Courts | Superior Court of California - County of San Francisco, *available at* https://www.sfsuperiorcourt.org/divisions/collaborative (last visited September 13, 2022).

[4] Medina-Zuniga made or received phone calls in San Francisco's Tenderloin on June 1, June 3, June 5, June 6, June 8, June 12, June 13, June 14, June 15, June 16, June 17, June 20, June 21, June 22, June 23, June 24, June 27, June 28, June 29, June 30, July 1, July 4, July 5, July 7, July 8, July 11, July 12, July 14, July 15, July 18, July 19, July 21, July 22, July 25, July 26, July 27, July 28, July 29, July 31, August 1, August 2, August 3, August 5, August 7, August 8, August 9, August 10, and August 12. Historical cell site data only shows a user's location when voice calls were actually made or received.

UNITED STATES' DETENTION MEMORANDUM   6
22-mj-71170 MAG

## III. ARGUMENT

### A. Legal standard

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406. "[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in § 3142(g)." *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *Id*. Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *Id*.

Where, as here, there is probable cause that a defendant has violated the Controlled Substances Act and faces a maximum of 10 years in prison or more, courts apply a rebuttal presumption against the defendant that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this scheme, the burden of production then shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Although the presumption is rebuttal, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382–83 (1st Cir. 1985) (Breyer, J.), abrogated on other grounds by *United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). In other words, the presumption is not so weak that if a defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id*. (stating that "a 'bursting bubble' approach might render the presumption virtually meaningless" because a defendant can "always provide the magistrate with some reason"). Even if the defendant rebuts the presumption, the presumption is not erased; instead, it remains in the case as an evidentiary finding militating against release that is to be

weighted along with other relevant factors.  *See U.S. v. King*, 849 F.2d 485 (11th Cir. 1988); *accord United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

If the court concludes that the defendant has rebutted the statutory presumption of detention, the court must consider four factors in determining whether the pretrial detention standard is met:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

**B.     The defendant is subject to a rebuttable presumption in favor of detention**

Medina-Zuniga is charged with one count of violating 21 U.S.C. § 841(a)(1) and (b)(1)(C) (possession with intent to distribute and distribution of fentanyl), which carries a maximum penalty of 20 years of imprisonment, and three counts of violating 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi) (possession with intent to distribute and distribution of 40 grams or more of a mixture or substance containing a detectable amount of fentanyl), which carries a maximum penalty of 40 years of imprisonment.  Because her maximum penalties are ten or more years, Medina-Zuniga is subject to a rebuttal presumption in favor of detention.  *See* 18 U.S.C. § 3142(e)(3)(A).  To overcome this presumption, Medina-Zuniga bears the burden of proving that she is both not a flight risk and that her release will not endanger the community.  She cannot do so.

**C.     The defendant is a danger to the community and Section 3142(g) factors weigh in favor of detention**

All of the relevant Section 3142(g) factors demonstrate that the defendant should be detained on the basis that she is a danger to the public.  She is also a flight risk, as evidenced by the fact that she is presently in removal proceedings, faces substantial prison time, and has a small child.

### 1. Nature and circumstance of the offense

The defendant is charged with four counts of violating 21 U.S.C. § 841(a), possession with intent to distribute. The first count, corresponding to the first controlled buy, charges her based on 18 U.S.C. § 841(a)(1)(C), which has no mandatory minimum. But in the last three controlled buys, Medina-Zuniga sold over forty grams of fentanyl each time. This results in her being charged based on 18 U.S.C. § 841(a)(1)(B)(vi), which carries a mandatory minimum of five years. And the charging document does not even take into account the 381 grams of fentanyl found on her person on the day of her arrest, or the additional fentanyl found in her apartment. In all, putting aside the narcotics found in her apartment, Medina-Zuniga sold or possessed on her person over a pound of fentanyl in just five separate days. And those five days represent less than 10% of the days Medina-Zuniga actually went into the Tenderloin to sell drugs during June, July, and August, and far less when compared to her total drug-dealing activity, which has targeted the Tenderloin, since 2019. It is impossible to know how many pounds of fentanyl she actually sold during the course of just these last three months, let alone the last three years, but the over-a-pound-in-five-days figure can help give one a sense that it must be immense.

In short, Medina-Zuniga is a recidivist drug dealer who has done untold harm to the Tenderloin through continuous illegal activity over the course of three years. Her "continuing involvement with the distribution of drugs" militates in favor of detention. *United States v. Wolf*, No. 5:15-CR-00263-EJD, 2015 WL 4573039, at *3 (N.D. Cal. July 29, 2015); *United States v. Fulgham*, Case No. CR 12–0124 CW (KAW), 2012 WL 2792439, at *4 (N.D. Cal. July 9, 2012) ("The Senate Report states: The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the 'safety of any other person or the community.' Defendant's tendency to repeatedly commit similar crimes shows that he poses an unmitigable danger to the community.").

### 2. Weight of the evidence

The weight-of-the-evidence factor under section 3142(g) weighs in favor of the government. Medina-Zuniga personally sold fentanyl and other narcotics to an undercover officer four times in two months. She was witnessed by multiple other officers, and each encounter was captured on video (though the video is blocked at times). And last week she was arrested in possession of and planning to

sell much more.  Although the fentanyl purchased during the fourth buy had not yet been lab-tested at the time the complaint was filed, it now has been, and the results are that the drugs purchased in each of the four controlled buys have been determined to be what Medina-Zuniga said they were: fentanyl.  Moreover, the tested weights from the second, third, and fourth buys each surpass the threshold set forth in 18 U.S.C. § 841(a)(1)(B)(vi) for a five-year mandatory minimum.

### 3. The defendant's history and characteristics

The defendant's history and characteristics, under § 3142(g)(3), support detention.  As outlined, the defendant's criminal history – which includes six arrests for drug dealing, at least five of which involved an officer watching her sell drugs and arresting her with drugs on her person or a bag under her control – establish her willingness to do harm to the community.  And those arrests have apparently left her completely undeterred.  Her third arrest took place less than two months after she received her first and only conviction, which acted as a resolution of her first two arrests.  Her third, fourth, and fifth San Francisco arrests were in flagrant violation or near-violation of a stay-away order by the San Francisco Superior Court (flagrant because she was not only in the area she was to stay away from, but she was also doing the very thing that caused her to be ordered to stay away in the first place – selling narcotics).  While those charges were pending in San Francisco's Community Justice Center Court, a restorative justice court that is meant to rehabilitate and ultimately lead to diversion, she 1) was arrested in Oakland for selling narcotics, 2)  traveled from Oakland to the Tenderloin on dozens and dozens of occasions to sell drugs, and 3) sold fentanyl to an undercover officer four times and intended to a fifth.  Other than having a small child (in whose presence in a small apartment she apparently stores and prepares large quantities of fentanyl, which is a deadly accident waiting to happen) and selling drugs to the people of the Tenderloin, she has no apparent ties to this community.  In short, her history demonstrates that she will continue to sell drugs, including fentanyl, undeterred by encounters with law enforcement, if given the opportunity at this juncture to do so.

### 4. Nature and seriousness of the danger to the community

The danger to this community that would be posed by the defendant's release are real.  Indeed, the nature of the defendant's crime – her sale of large quantities of fentanyl – is particularly troubling in light of the ongoing fentanyl crisis in the Tenderloin.  As Mayor London Breed has stated, "We are

losing over two people a day to drug overdoses, mostly to fentanyl, and mostly in the Tenderloin and SoMa.  This is a public health emergency demanding a crisis level response, with massive urgency, coordination, and determination to confront this epidemic."[5]  Medina-Zuniga's conduct has contributed to this crisis in an incremental but horrifyingly consistent way: with twenty commutes to the Tenderloin in June, eighteen in July, and nine in the first twelve days of August, she appears to commute to the Tenderloin on nearly 70% of her days (data shows she takes every Saturday off).  In short, like other commuters, she has a job, but hers is to prey upon the vulnerable Tenderloin population.

### D.  No conditions of pretrial release can guarantee the safety of the community at large

As previously discussed, Medina-Zuniga's criminal history makes clear that she has not thus far been deterred from crime, and in fact insists on openly and flagrantly defying the law for her own gain.  The fact of her single conviction has not deterred her from criminal behavior; the fact of probation and stay-away orders has not dissuaded her from violating each of those; the facts of pending state-level criminal charges and her referral to a restorative justice court that places trust in defendants to want not to commit crime and is aimed at rehabilitation has not discouraged her from committing more and new crime with frightening frequency and regularity.  When given opportunity after opportunity to succeed out of custody (which is what the San Francisco Superior Court has given to her again and again), the defendant has repeatedly taken advantage of sentencing, post-conviction, and pretrial leniency in other jurisdictions to victimize more people.  This history shows that there is no set of conditions that would make federal pretrial supervision a success; rather, it would only once again allow the defendant a further opportunity to harm the citizens of San Francisco.

### E.  The defendant is also a serious flight risk

As described above, Medina-Zuniga has previously been arrested five times by the San Francisco Police Department.  With regard to at least two of those cases, she appears to have been on active bench warrant status at the time of her next arrest.  In other words, even when faced with the lenient consequences to be had in the San Francisco Superior Court, Medina-Zuniga had a habit of not showing up for court proceedings until she was arrested and brought into court on other charges.  It is true that

---

[5] "Mayor London Breed Declares State of Emergency in the Tenderloin," Dec. 17, 2021 (https://sfmayor.org/article/mayor-london-breed-declares-state-emergency-tenderloin).

UNITED STATES' DETENTION MEMORANDUM     11
22-mj-71170 MAG

she stayed in San Francisco on those prior occasions and made her last appearance at Community Justice Center Court.  But there is a difference between the present arrest and her previous San Francisco arrests that suggests that, this time, she can't be counted on to do so.  For the combined conduct in her first two local arrests for drug sales, Medina-Zuniga received two years of state court probation, served only four days in custody, and was convicted of an immigration-friendly misdemeanor.  Her third, fourth, and fifth local arrest have been bundled into a diversion court, where she has apparently convinced pretrial and the judge that she is doing well and is headed for dismissal.  This time, she has been charged federally, and three of her charges carry mandatory five-year minimums.  She also has ongoing removal proceedings against her.  And she has a four-year-old child.  But for a respect for the laws of this country, there is literally no reason for Medina-Zuniga to stay here and face her charges.  And she has shown again and again, through violations of probation and stay-away orders and recurrent new crime, that she has no such respect.  Even were she to be released to a halfway house, there would be nothing to stop her simply walking away.  In short, the risk that Medina-Zuniga will flee is too great to allow her to be released during the pendency of this case.

## CONCLUSION

In sum, the defendant represents both a flight risk and danger to the community if released.  Given this, and for the foregoing reasons, the Court should grant the government's motion to detain Cesia Medina-Zuniga pending trial.

DATED:  September 14, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


*/s/ Alethea M. Sargent*
ALETHEA M. SARGENT
Assistant United States Attorney